**ADVANCE BRONZE, INC., Petitioner,**

v.

**Elizabeth DOLE, Secretary of Labor; and the Occupational Safety and Health Review Commission, Respondents.**

No. 89–3688.

United States Court of Appeals,
Sixth Circuit.

Argued April 12, 1990.

Decided Oct. 26, 1990.

**946**

Robert D. Moran (argued), Washington, D.C., for petitioner.

Ray Darling, Secretary, Washington, D.C., for respondent Occupational Safety & Health Review Com'n.

Maureen M. Cafferkey, Office of the Sol., U.S. Dept. of Labor, Cleveland, Ohio, Patrick D. Gilfillan (argued), U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for respondent U.S. Dept. of Labor.

Before KEITH and MILBURN, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

KEITH, Circuit Judge.

Advance Bronze, Inc. ("Advance") petitions this court for review of the June 27, 1989 final order of the Occupational Safety and Health Review Commission (the "Commission"). The Commission found that Advance violated the Occupational Safety and Health Act, 29 U.S.C. §§ 651 *et seq.* (the "Act"); the federal standards regulating lead contaminants, 29 C.F.R. § 1910.1025 *et seq.;* and the federal regulations governing personal protective equipment in the workplace, 29 C.F.R. §§ 1910.132 *et seq.* (collectively the "lead standards"). Advance argues that the Administrative Law Judge ("ALJ") erred by finding that it had violated the lead standards. Furthermore, Advance contends that the lead standards are: legally invalid; inapplicable to its operations; and not enforceable against its nonferrous foundry. For the reasons set forth below, we AFFIRM the June 27, 1989 final order of the Commission.

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. DECISION OF THE COMMISSION

In January 1988, representatives of the United States Secretary of Labor (the "Secretary")[1] conducted an inspection of Advance's Lodi, Ohio, nonferrous foundry. As a result of the inspection, the Secretary determined that Advance had failed to correct violations of the lead standards that had been cited in 1985. The Secretary then issued several failure-to-abate notices and cited Advance for nine violations.

Advance contested the Secretary's notification and citations. After a hearing, the ALJ vacated two violations of the lead standards and affirmed seven others, assessing a total penalty of $11,180. Pursuant to 29 U.S.C. § 661(j), Advance petitioned the Commission for review of the ALJ's decision. The Commission refused to grant review, and the ALJ's decision became the Commission's final order on June 27, 1989. On July 24, 1989, Advance filed a timely notice of appeal.

### B. STATUTORY AND REGULATORY REQUIREMENTS

#### 1. 1971 Lead Standards

In *United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1204 (D.C.Cir.

---

**1.** In this opinion, the term "Secretary" will refer to: (1) the Secretary of Labor; (2) the Assistant Secretary of Labor for Occupational Safety and Health, who has been granted, by the Secretary of Labor, the authority to set standards under 29 U.S.C. § 655; and (3) the Occupational Safety and Health Administration ("OSHA"), which is directed by the Assistant Secretary of Labor for Occupational Safety and Health. *See United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1202 n. 1 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) (hereinafter *"Steelworkers"*), the D.C. Circuit summarized and persuasively justified the 1971 lead standards:

> [I]n the United States today, where industry consumes annually over one million tons of lead, at least 800,000 workers, representing 120 occupations in over 40 industries, are exposed to airborne lead on the job and thereby face the dangers of lead poisoning.
>
> As scientific means of measuring lead exposure and lead absorption have improved over the last 50 years, scientists and the government have set lower figures for the maximum tolerable level of airborne lead exposure, but have struggled in setting a precise permissible exposure limit (PEL). A PEL of 550 $\mu g/m^3$ (500 micrograms of lead per cubic meter of air) was once the consensus figure, but in 1933 the United States Public Health Service recommended, and many industries at least theoretically adopted, a goal of 150 $\mu g/m^3$. In 1957 the American Conference of Governmental Industrial Hygienists increased the recommended maximum to 200 $\mu g/m^3$, but in 1971 lowered it once again to 150 $\mu g/m^3$. However, in that same year, 1971, the newly created Occupational Safety and Health Administration, acting without rulemaking under Section 6(a) of the OSH Act, 29 U.S.C. § 655(a) (1976), adopted the "national consensus standard" recommended by the American National Standards Institute, which set a PEL, measured as an eight-hour time-weighted average, of 200 $\mu/m^3$.

*Steelworkers,* 647 F.2d at 1204 (citations omitted). In addition, the 1971 lead standards required employers to achieve the PEL with administrative and engineering controls whenever feasible and use personal protective equipment, such as respirators, only as supplements. 29 C.F.R. § 1910.1000(e).

### 2. 1978 Lead Standards

In 1973, the Director of the National Institute for Occupational Safety and Health ("NIOSH") advised the Secretary of Labor to lower the PEL to 150 $\mu g/m^3$. Two years later, the NIOSH Director suggested that the Secretary lower the PEL still further. *See Steelworkers,* 647 F.2d at 1204. After conducting public hearings in 1977, the Secretary closed the record on August 8, 1978 and issued the final lead standards (hereinafter "the lead standards") that reduced the PEL from 200 $\mu g/m^3$ to 50 $\mu g/m^3$. *See id.* (citing 29 C.F.R. §§ 1910.1025 *et seq.*).

The lead standards mandate several levels of employer compliance methods. The employer must implement engineering and work practice controls to meet the PEL;[2] if these controls are insufficient, then the employer must provide employee respirators[3] as a supplement. *See* 29 C.F.R. § 1910.1025(e)(1)(i) ("Wherever the engineering and work practice controls which can be instituted are not sufficient to reduce employee exposure to or below the permissible exposure limit, the employer shall nonetheless use them to reduce exposures to the lowest feasible level and shall supplement them by the use of respiratory protection....").

### 3. Judicial Review of the Lead Standards

Prior to issuing its opinion, the *Steelworkers* court considered industry challenges to the Secretary's rulemaking and on March 1, 1979, stayed certain provisions of the lead standards pending judicial review. *See* 44 Fed.Reg. 14554–14555 (Mar. 13, 1979) (quoting *Steelworkers,* No. 79–

---

**2.** Engineering controls include product substitution, process or equipment redesign and enclosure, exhaust or dilution ventilation, and employee isolation. Work practice controls include various measures, such as keeping lids on containers and observing required hygiene practices. Administrative controls include employee rotation to reduce the daily exposure of each individual worker. *See* 43 Fed.Reg. 52989–52990 (Nov. 14, 1978).

**3.** Respirators, defined by occupational safety standards, are screenlike devices worn over the mouths and/or noses of workers to prevent them from breathing air contaminated by lead. *See* 29 C.F.R. § 1910.134(a).

1048 (D.C.Cir. Mar. 1, 1979) (order granting stay)). During the stay, the court ordered that the Secretary's 1971 lead standards, 29 C.F.R. § 1910.1000, Table Z–2 [200 μg/m³], remain in effect. *See id.* After publishing the court's order in the Federal Register, the Secretary announced that it would continue to enforce the 1971 lead standards' PEL of 200 μg/m³ until the court issued its final judgment. Thus, 29 C.F.R. § 1910.1025(e)(1), which requires compliance with a 50 μg/m³ PEL through engineering and work practice controls, was neither implemented nor enforced during the stay. *See id.*

On August 18, 1980, the *Steelworkers* court upheld the lead standards issued in 1978. 647 F.2d at 1204, 1311. The court affirmed the Secretary's determination that reducing ambient lead from 200 to 50 μg/m³ would substantially reduce a significant risk of harm to employees exposed to lead contaminants. *See id.* at 1250, 1270. The court also concluded that the Secretary's record evidence was insufficient because it failed to demonstrate that 50 μg/m³ could be achieved through engineering and work practice controls in certain industries, including the nonferrous foundries. *See id.* at 1311. Thus, the court remanded the case with instructions that the Secretary reconsider the feasibility of 50 μg/m³ as a standard for the industries in question, including the nonferrous foundry industry. *See id.*

For the nonferrous industry, the court held that part of the March 1, 1979 stay pertaining to engineering and work practice controls would remain in effect pending the Secretary's feasibility studies.[4] However, during the Secretary's reconsideration, the nonferrous foundry industry and other remand industries would be "immediately required to meet the PEL of 50 μg/m³ by some combination of engineering, work practice and respirator controls." *Steelworkers*, 647 F.2d at 1311.

## C. ESSENTIAL FACTS

Advance manufactures bronze bearings for the defense, automotive and mining industries. To produce the bearings, Advance melts and molds bronze scraps and ingots. This process exposes Advance employees to lead contaminants. The exposed employees include: the furnace tenders, who operate the furnaces during the melting process; the set-up people, who prepare the molds; and the pourers, who carry and pour the molten metal into the molds.

During the Secretary's January 1988 inspection, lead levels in the foundry areas at Advance measured 322.4 μg/m³, 585.5 μg/m³, 778 μg/m³, 1128 μg/m³. During the January 1988 inspection, Advance used respirators to protect the foundry workers.

Advance's employees wear cotton uniforms with spats and air hats. The Secretary has determined that the cotton uniforms will not protect employees against a major splash of molten metal. Advance does not require its employees to wear aprons or leggings to protect against splashes of molten metal. Although aprons are available at the foundry, Advance does not require that they be worn. Advance considers aprons and leggings hazardous, arguing that metal sparks might become trapped in the back of an apron or legging and cause an employee to be burned.

### 1. 1985 Inspection

The Secretary inspected Advance's workplace in April 1985, and cited Advance for numerous violations of 29 C.F.R. §§ 1910.-1025 *et seq.* After the citation was issued, Advance and the Secretary entered into a settlement agreement in June 16, 1986, which became the Commission's final order on August 25, 1986. Advance agreed to schedule abatement dates for the cited violations. Within thirty days, Advance

---

4. On January 30, 1990, the Secretary published her conclusions on the feasibility question remanded by the D.C. Circuit. *See* 55 Fed.Reg. 3146, 3155–3166 (Jan. 30, 1990). *See also Steelworkers*, 647 F.2d at 1311. The Secretary determined that it was economically feasible for small nonferrous foundries to use engineering controls capable of reaching a 75 μg/m³ PEL, while a PEL of 50 μg/m³ was found economically feasible for large nonferrous foundries. *See* 55 Fed.Reg. 3155–3166.

agreed: to institute a written procedure for the use of respirators, aprons and leggings; to follow the appropriate air monitoring schedule; and to refer employees for medical examinations, if warranted by blood tests indicating lead contamination. Within sixty days, Advance agreed to institute a comprehensive respirator protection program. Within one year, Advance agreed to implement engineering and work practice controls sufficient to reduce airborne lead levels to 200 $\mu g/m^3$. As an interim measure, Advance agreed to provide employees with appropriate respirator protection.

### 2. 1987–88 Inspections

The Secretary conducted follow-up inspections of the foundry in December 1987, and January 1988, to determine whether Advance had corrected the violations cited in 1985. The inspections revealed that none of the previously uncovered violations had been entirely abated. Thus, the Secretary issued a failure-to-abate-notice for each unabated item and proposed penalties in the amount of $11,180.

### 3. Decision of the Administrative Law Judge

Following a hearing on the merits, the ALJ found that the lead standards apply to Advance because *Steelworkers* did not stay enforcement of the lead standards in their entirety, but allowed nonferrous foundries to use respirators in addition to engineering and work practice controls to comply with the 50 $\mu g/m^3$ PEL. *See Steelworkers*, 647 F.2d at 1311; Joint Appendix at 256 (quoting *Secretary of Labor v. Advance Bronze, Inc.*, No. 88–313/88–681, decision at 9 (O.S.H.R.C. Apr. 27, 1989)). The ALJ was unpersuaded by Advance's argument that the PEL violations had been abated. Even if there were occasional clear days, the lead standards would still require Advance to implement engineering and work practice controls to reduce and maintain the PEL. The ALJ also held that the Secretary established that such controls were feasible for Advance's plant and that Advance had failed to prove that such controls were infeasible. The ALJ's decision affirmed seven of the citations served

by the Secretary upon Advance and vacated two others. After a review of the record evidence, the ALJ issued an order stating:

1. [Advance's] motion for summary judgment is denied.

2. The citation alleging repeat violation of 29 C.F.R. § 1910.132(a) is affirmed and a penalty in the sum of $700.00 is hereby assessed. [This citation was issued due to Advance's failure to provide aprons and leggings to employees who poured molten metal.]

3. The notification of failure to abate violation of 29 C.F.R. § 1910.1025(e)(1) is affirmed and a penalty in the sum of $4,000.00 is hereby assessed. [This notification was issued due to Advance's failure to meet the 200 $\mu g/m^3$ PEL with engineering and work practice controls in the foundry area.]

4. The notification of failure to abate violation of 29 C.F.R. § 1910.1025(d)(6)(iii) is affirmed and a penalty in the sum of $800.00 is hereby assessed. [This notification was issued due to Advance's failure to conduct quarterly air monitoring based on the results of 1980 air sampling.]

5. The notification of failure to abate violation of 29 C.F.R. § 1910.1025(j)(3)(i)(A) is affirmed and a penalty in the sum of $4,000.00 is hereby assessed. [This notification was issued due to Advance's failure to provide medical examinations and consultations to employees whose blood lead levels exceeded 40 $\mu g/100$ g.]

6. The notification of failure to abate violation of 29 C.F.R. § 1910.1025(j)(3)(i)(B) is hereby vacated.

7. The citation alleging serious violation of 29 C.F.R. § 1910.1025(f)(3)(ii) is affirmed and a penalty in the sum of $560.00 is hereby assessed. [This citation was issued due to Advance's failure to conduct periodic respirator fit testing.]

8. The citation alleging a repeat violation of 29 C.F.R.1910.1025(c)(1) is affirmed and a penalty in the sum of $1,120.00 is hereby assessed. [This citation was issued due to Advance's failure

to meet the 50 $\mu g/m^3$ PEL with a combination of engineering, work practice control and respirator use.]

9. The citation alleging violation of 29 C.F.R. § 1910.1025(f)(4)(i) is affirmed. [This citation was issued due to Advance's failure to institute an adequate respirator protection program.]

10. The citation alleging violation of 29 C.F.R. § 1910.1025(j)(2)(i) is hereby [vacated].[5]

Joint Appendix at 268–69 (quoting *Secretary of Labor v. Advance Bronze, Inc.,* No. 88–313/88–681, order at 21–22 (O.S.H.R.C. Apr. 27, 1989)).

## II. ANALYSIS

### A. STANDARD OF REVIEW

▮ If supported by substantial evidence on the record taken as a whole, the Commission's findings of fact shall be conclusive. *See Empire–Detroit Steel v. OSHRC,* 579 F.2d 378, 383 (6th Cir.1978); *Dunlop v. Rockwell International,* 540 F.2d 1283, 1287 (6th Cir.1976). *See also* 29 U.S.C. § 660(a). "Substantial evidence was defined by this court in *Jones v. Priebe,* 489 F.2d 709, 710 (6th Cir.1973), *quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 [59 S.Ct. 206, 216, 83 L.Ed. 126] (1938), as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Empire–Detroit Steel,* 579 F.2d at 383. Moreover, adjudicatory conclusions of the Commission can be set aside only when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### B. APPLICATION OF THE LEAD STANDARDS TO ADVANCE

▮ On appeal, Advance contends that the lead standards are not enforceable against its nonferrous foundry; thus, the Commission erred in affirming the order of the ALJ. The Secretary responds that the lead standards clearly apply to Advance's nonferrous foundry. We agree.

Advance correctly argues that the *Steelworkers* court stayed a number of provisions in the lead standards, pending judicial review. *See* 44 Fed.Reg. 14554–14555 (Mar. 13, 1979) (quoting *Steelworkers,* No. 79–1048 (D.C.Cir. Mar. 1, 1979) (order granting stay)). The court, however, ultimately affirmed the lead standards in all relevant parts. The *Steelworkers* court then lifted the stay, except as to the engineering and work practice controls requirement of paragraph (e)(1). *See Steelworkers,* 647 F.2d at 1311; 29 C.F.R. § 1910.1025(e)(1). None of the citations involved in this case pertain to the stay of the paragraph (e)(1) requirement that 50 $\mu g/m^3$ PEL be achieved solely by engineering and work practice controls. Thus, the revised lead standards clearly apply to Advance.

▮ Advance also contends that the lead standards are not applicable to it because the Secretary failed to prove that the "lead" measured at its nonferrous foundry constituted "lead" as defined by 20 C.F.R. §§ 1910.1025 *et seq.* Substantial evidence, however, supports the determination of the Secretary that unacceptable levels of airborne lead were recorded during the inspections of Advance's foundry.

Upon issuing the lead standards in 1978, the Secretary outlined its application and parameters:

The lead to which this standard applies is defined to include metallic lead, all inorganic lead compounds, and organic lead soaps. All of these substances are covered within the scope of a single standard because they generally react in a chemically and toxicologically similar manner in the human body. On the other hand, most organic lead compounds, except for organic lead soaps, have varying degrees of toxicity or have toxicologi-

---

5. The ALJ's order actually states: "10. The citation alleging violation of 29 C.F.R. § 1910.25(j)(2)(1) is hereby affirmed." This statement, however, was apparently a typographical error which should read: "10. The citation alleging violation of 29 C.F.R. § 1910.25(j)(2)(1) is hereby [vacated]." *See* Joint Appendix at 309 (quoting *Secretary of Labor v. Advance Bronze, Inc.,* No. 88–313/88–681 (O.S.H.R.C. Jul. 13, 1989) (order amending decision)).

cal properties different than the inorganic group, and thus are excluded from the scope of this standard.

43 Fed.Reg. 52985/3 (Nov. 14, 1978) (Preamble to Final Rule). Thus, the lead standards apply to all inorganic lead and lead compounds, and to inorganic lead soaps. Certain organic leads, such as tretraethyl, are not covered.

The lead standards are applicable to the nonferrous foundry industry because its members generate metallic lead compounds in a form likely to be inhaled or ingested during the production of castings. See 54 Fed.Reg. 29142 (Jul. 11, 1989). Advance is a member of the nonferrous foundry industry because it manufactures bearings by melting and casting lead-based alloys (7–10% lead) 200 days per year. When the Secretary's representatives analyzed lead samples collected at Advance's foundry, they found lead levels in excess of the limits set for inorganic lead and its compounds as defined at 29 C.F.R. § 1910.1025. Thus, in reliance upon substantial evidence and in accord with the Act, the Commission correctly affirmed the order of the ALJ finding the lead standards applicable to Advance.

C. VIOLATIONS OF THE LEAD STANDARDS

1. Violation of 29 C.F.R. § 1910.132(a)

█ To establish a violation of the lead standards, the Secretary must show that: (1) the cited standard applies; (2) the employer failed to comply with the standard; and (3) the employees were exposed to the hazardous condition. See Quality Stamping Products, Inc. v. OSHRC, 709 F.2d 1093, 1099 (6th Cir.1983).

█ Section 1910.132(a) requires that appropriate personal protective equipment be provided to employees and used whenever necessary to prevent hazards which might cause a workplace injury or impairment. See 29 C.F.R. § 1910.132(a). Advance was cited for a repeat violation of Section 1910.-132(a) in 1988. Thus, Advance concedes that it did not provide aprons and leggings to employees working with molten metal at the time of the Secretary's inspections.

Advance argues, however, that such protections are not customary in the nonferrous foundry industry. Advance continues that the Secretary failed to meet her burden of proving that reasonably prudent employers in the nonferrous foundry industry recognize the hazard of molten metal splashes and protect against it by providing aprons and leggings to employees. See Ray Evers Welding v. OSHRC, 625 F.2d 726, 731 (6th Cir.1980).

At the hearing before the ALJ, the experts for both Advance and the Secretary agreed that employees can be burned by splashes of molten metal. The experts, however, disagreed over whether the reasonably prudent employer would protect against splashes of molten metal by using aprons and leggings. Advance's experts asserted that the custom in the industry is not to provide such protection and that cotton uniforms provide sufficient protection. The Secretary's experts asserted that employers in the nonferrous foundry industry provide aprons and leggings, which are recommended by the American Foundrymen's Association.

As the factfinder, the ALJ was entitled to credit the Secretary's evidence over that of the employer, Advance. See J.L. Foti Construction Co. v. OSHRC, 687 F.2d 853, 855 (6th Cir.1982). See also Kelly–Springfield Tire Co. v. Donovan, 729 F.2d 317, 321 (5th Cir.1984). The substantial evidence standard limits our review of the ALJ's findings of fact. See Empire–Detroit Steel, 579 F.2d at 383. Thus, finding a "warrant in the record for the result below, that result must stand, even if we might have interpreted the evidence differently in a trial de novo." J.L. Foti Construction, 687 F.2d at 855.

█ Advance also argues that Section 1910.132(a) is procedurally invalid, and thus, void as currently applied. Advance specifically challenges the validity of the notice and comment procedures which preceded the promulgation of Section 1910.-132(a). Section 1910.132(a), however, was adopted under Section 6(a) of the Act, 29 U.S.C. § 655(a), which authorizes the Secre-

tary to adopt within two years "any established Federal standard" without the notice and comment procedures usually required by the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Thus, this court will not allow Advance to escape liability by raising a procedural attack upon Section 1910.132(a). *See National Industrial Constructors Inc. v. OSHRC*, 583 F.2d 1048, 1052 (8th Cir.1978) ("The agency's interest in finality, coupled with the burden of continuous procedural challenges raised whenever an agency attempts to enforce a regulation, dictates against providing a perpetual forum in which the Secretary's procedural irregularities may be raised."). We, therefore, conclude that the Commission correctly affirmed the decision of the ALJ finding Advance in repeat violation of 29 C.F.R. § 1910.132(a).

### 2. Violation of 29 § 1910.1025(e)(1)

Pursuant to *Steelworkers* and Section 1910.1025(e)(1), nonferrous foundries are required to use employee respirators, in addition to engineering and work practice controls, to reduce and minimize employee exposure to lead contaminants. *See* 29 C.F.R. § 1910.1025(e)(1). Advance concedes that it failed to meet the 200 $\mu g/m^3$ PEL for nonferrous foundries mandated by Section 1910.1025(e)(1), but argues that the Secretary failed to establish a violation by proving that the 200 $\mu g/m^3$ requirement was exceeded *more than 30 days per year*. *See* 29 C.F.R. § 1910.1025(e)(1)(ii) (applying less stringent standards where the employee is exposed to lead above the PEL, but for less than 30 days per year). Advance also argues that the engineering and work practice controls were not feasible.

▪ Substantial evidence supports the ALJ's finding that during the 1985–88 period, Advance employees were exposed to lead above the 200 $\mu g/m^3$ PEL for more than thirty days per year. According to the Secretary's January 1988 inspections and air quality tests at Advance's foundry, Advance's employees had the following levels of exposure to airborne lead: Jack Davis, 322.4 $\mu g/m^3$; Terry Walters, 585.8 $\mu g/m^3$; Robert Straight, 1,128.0 $\mu g/m^3$;

Mark Waggaman, 778.0 $\mu g/m^3$; and Gary Boulet, 668.0 $\mu g/m^3$. Advance admitted that the operations in progress were representative of its foundry work since 1985. Because Advance offered this admission and stated that it pours lead-based alloys over two hundred days per year, the ALJ reasonably drew the inference that for more than 30 days per year, the lead standards were exceeded.

▪ The ALJ correctly rejected Advance's argument that the Secretary failed to prove the feasibility of implementing engineering, work practice and respirator controls to achieve a 200 $\mu g/m^3$ PEL. In this dispute, Advance, not the Secretary, bears the burden of proof. In *Steelworkers*, the court affirmed the Secretary's determination that all lead industries, including nonferrous foundries, can feasibly achieve a 200 $\mu g/m^3$ PEL. *See Steelworkers*, 647 F.2d at 1311. *See also infra* note 2. Thus, Advance bears the burden of proving that the lead standards are infeasible. *See Steelworkers*, 647 F.2d at 1270 ("[I]n an enforcement proceeding, the employer could ... expect the agency and court to entertain the affirmative defense that the standard had proved generally infeasible [and] the employer would bear the burden of proof."). Because: (1) Advance has failed to evidence its infeasibility argument; and (2) Advance conceded, in its 1986 settlement agreement with the Secretary, that its foundry could achieve 200 $\mu g/m^3$ within one year, we concluded that the Commission properly affirmed the order of the ALJ finding Advance in violation of 29 C.F.R. § 1910.1025(e)(1).

### 3. Violation of 29 C.F.R. § 1910.1025(d)(6)(iii)

▪ Section 1910.1025(d)(6)(iii) provides, in pertinent part:

> If the initial monitoring reveals that employee exposure is above the permissible exposure limit the employer shall repeat monitoring quarterly. The employer shall continue monitoring at the required frequency until at least two consecutive

measurements, taken at least 7 days apart, are below the PEL....

29 C.F.R. § 1910.1025(d)(6)(iii).

On May 30, 1985, the Secretary cited Advance for failure to conduct quarterly air monitoring, in violation of Section 1910.-1025(d)(6)(iii), as April 24, 1980 was the last date Advance had conducted an air monitoring. The record indicates that when the Ohio Industrial Commission conducted an air monitoring on April 3, 1987, it found that four Advance employees were exposed to excessive levels of lead contaminants. During the Secretary's 1988 inspection, Advance conceded that its quarterly air monitoring had not been regularly scheduled. Advance now argues, however, that this court should vacate the ALJ's failure-to-abate notice because the Secretary failed to provide the ALJ with test results of its 1980 air monitoring at Advance's foundry. Advance's challenge to the ALJ's failure-to-abate notice must fail because Advance has the burden to show that either: (1) the 1985 violation was cited in error; or (2) the 1985 violation was subsequently corrected. *See Quality Stamping Products, Inc.*, 709 F.2d at 1099. We hold that the Commission correctly affirmed the order of the ALJ finding Advance in violation of 29 C.F.R. § 1910.1025(d)(6)(iii).

4. Violation of 29 C.F.R. § 1910.1025(j)(3)(i)(A)

■ Section 1910.1025(j)(3)(i)(A) requires that at least annually, employers "make available" medical examinations and consultations to each employee for whom a blood test indicates a blood lead level at or above 40 $\mu$g/100g. Because substantial evidence indicates that Advance had no annual employee examination policy, but provided medical examinations and consultations only upon receiving individual employee requests, we conclude that the Commission correctly affirmed the decision of the ALJ finding Advance in violation of 29 C.F.R. § 1910.1025(j)(3)(i)(A).

Historically, lead industry workers have avoided medical treatment, lied to physicians about their symptoms, or consumed self-prescribed drugs due to a well-grounded fear that if their chronic illnesses became known to their employers, they might be fired or transferred to a low-paying job. *Steelworkers*, 647 F.2d at 1237. Thus, the Secretary has recognized that an acceptable medical surveillance plan must encourage meaningful participation by resistant lead industry workers. 43 Fed.Reg. 54445 (Nov. 21, 1978).

The record indicates that Advance has: (1) failed to encourage employee participation in medical examinations; (2) never scheduled regular annual medical examinations for employees prior to being cited; (3) never informed employees of its unwritten policy that they could receive examinations upon request; and (4) failed to provide annual medical examinations to identify employees with dangerously high blood-lead levels and thus, has severely limited the efficacy of later medical intervention. *See* 43 Fed.Reg. 54441 (Nov. 21, 1978) ("Where a lead-related disease has been or is being contracted, the worker has a right to know of this as soon as possible so that he or she can make personal decisions about health care and employment matters."). On these facts, we will not disturb the decision of the ALJ that Advance did not "make available" medical examinations and consultations as required by 29 C.F.R. § 1910.1025(j)(3)(i)(A).

5. Violation of 29 C.F.R. § 1910.1025(f)(3)(ii)

■ Section 1910.1025(f)(3)(ii) states that for each employee wearing negative pressure respirators, employers shall perform quantitative or qualitative face fit-tests at the time of the initial fitting and at six month intervals thereafter. *See* 29 C.F.R. § 1910.1025(f)(3)(ii).

After the Secretary's 1988 inspection of Advance's foundry, the ALJ made the following findings of fact:

Industrial Hygienist [Leslie] Grove [("Grove")] testified that Gary Boulet [("Boulet"), Advance's] foreman in the foundry area, was found to be exposed to lead in excess of the PEL. Boulet wore a negative pressure respirator for several years but stated he had not been face

fitted every six months since he began using it. [Vincent Delpropost ("Delpropost"), Advance's plant manager,] informed Grove that fit tests had been conducted when the respirators were purchased in 1985, but no six-month tests were conducted after that.

Joint Appendix at 260–61 (quoting *Secretary of Labor v. Advance Bronze, Inc.,* No. 88–313/88–681, decision at 13–14 (O.S. H.R.C. Apr. 27, 1989) (citations omitted)).

On appeal, Advance concedes that it failed to fit-test Boulet's respirator every six months as required. Advance contends, however, that fit-testing is necessary only if an employee is required to wear a respirator and that Boulet, as a foreman, was not required to wear one. The Secretary responds that Advance misapprehends the lead standards. Section 1910.1025(f)(1)(ii) requires employers to provide respirators to all employees in work environments where the 50 $\mu$g/m$^3$ PEL can only be achieved with a combination of engineering and work practice controls and respirators. *See* 29 C.F.R. § 1910.1025(f)(1)(ii). In the 1988 inspection, the Secretary determined that Boulet's airspace contained ambient lead levels of 66.8 $\mu$g/m$^3$. Although Section 1910.1025(f) required Advance to provide Boulet with a respirator and to fit-test the respirator every six months, Advance failed to adhere to the requirements of the lead standards. After considering the evidence relied upon by the ALJ, we will not disturb his finding that Advance violated 29 C.F.R. § 1910.1025(f)(3)(ii).

### 6. Violation of 29 C.F.R. § 1910.1025(c)(1)

Section 1910.1025(c)(1) requires the employer to insure that no employee is exposed to lead contaminants at concentrations greater "than fifty micrograms per cubic meter of air (50 $\mu$g/m$^3$) averaged over an 8–hour period." 29 C.F.R. § 1910.1025(c)(1).

When the Secretary conducts an inspection of an employer's foundry, she will only consider the protection factor of employee respirator use if the employer has met all the requirements of Section 1910.1025(f).

29 C.F.R. § 1910.1025(c)(3) states, in pertinent part:

When respirators are used to supplement engineering and work practice controls to comply with the PEL and all the requirements of paragraph (f) have been met, employee exposure, for the purpose of determining whether the employer has complied with the PEL may be considered to be at the level provided by the protection factor of the respirator for those periods the respirator is worn.

*Id.*

In the present case, the testimony of Grove, Boulet and Delpropost establishes Advance's violation of Section 1910.1025(f)(3)(ii). The same testimony also establishes that: (1) Boulet, Advance's foreman, wore a respirator and was exposed to lead in excess of 50 $\mu$g/m$^3$; and (2) Advance failed to periodically fit-test Boulet's respirator. Because Advance failed to meet the requirements of Section 1910.1025(f), as mandated by Section 1910.1025(c)(3), the ALJ was justified in considering the actual PEL, as opposed to the PEL minimized by Boulet's non-fit-tested respirator. *See* 29 C.F.R. § 1910.1025(c)(3). Given the mandate of Section 1910.1025(c)(3) and the testimony of Advance's employees, we conclude that the Commission correctly affirmed the decision of the ALJ that Advance violated 29 C.F.R. § 1910.1025(c)(1).

### 7. Violation of 29 C.F.R. § 1910.1025(f)(4)(i)

Section 1910.1025(f)(4)(i) requires employers to institute adequate respiratory protection programs in accordance with 29 C.F.R. § 1910.134(b). An adequate respiratory protection program must have written standard operating procedures for selection and use of respirators, as well as regular program effectiveness evaluations. If the program is incomplete, then the program is defective. *See* C.F.R. § 1910.134(b).

In the case at bar, the Secretary originally argued, before the ALJ, that Advance violated Section 1910.1025(f)(4)(i) by failing to determine its employees' medical ability to wear respirators under Section 1910.-

134(b)(10). See 29 C.F.R. § 1910.134(b)(10) ("Persons should not be assigned to tasks requiring use of respirators unless it has been determined [by a local physician] that they are physically able to perform the work and use the equipment."). Subsequently, Boulet, the Advance foreman responsible for training foundry workers, testified that Advance had no written procedures for selection and use of respirators, as required by Section 1910.134(b). On the basis of Boulet's testimony, the ALJ decided that Advance had violated Section 1910.-1025(f)(4)(i) and the Commission affirmed that ALJ's decision.

On appeal, Advance petitions this court to reverse the Commission's final order because the ALJ abandoned the Secretary's original justification for citing Advance under Section 1910.1025(f)(4)(i). Advance contends that, by affirming on the basis of Boulet's admission, the ALJ effectively amended the Secretary's original citation to conform to the evidence. Advance concludes that by shifting justification for the original citation after the hearing, the ALJ violated Advance's right to procedural due process. However, when an ALJ amends a citation to conform to the evidence, this action does not necessarily constitute a violation of due process. *See Long Mfg. Co. v. OSHRC*, 554 F.2d 903, 907 (8th Cir.1977) ("An employer ... does not have any vested right to go to trial on the specific charge mentioned in the [Secretary's] citation...."). *Cf.* Fed.R.Civ.P. 15(b) ("If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended...."). Because the ALJ acted within the scope of his authority and Advance has failed to demonstrate that it was surprised or prejudiced by the ALJ's actions, we will not disturb the decision of the ALJ that Advance violated 29 C.F.R. § 1910.1025(f)(4)(i).

## III.  CONCLUSION

The protection of all Americans from exposure to airborne lead in the workplace remains an extremely important national goal. Exercising her authority under the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, the Secretary cited Advance for nine violations of the lead standards. Substantial evidence supports the findings of the ALJ that Advance was properly cited for seven violations of the lead standards. Accordingly, we conclude that the Commission correctly affirmed the decision of the ALJ. The June 27, 1989 final order of the Commission is AFFIRMED.