96 F.3d 1448
 17 O.S.H. Cas. (BNA) 1741, 1996 O.S.H.D. (CCH)
P 31,144
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
STEIN, INC., Respondent-Appellant,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Robert
B. Reich, United States Secretary of Labor,
Complainant-Appellees.
 No. 95-3686.
 United States Court of Appeals, Sixth Circuit.
 Sept. 5, 1996.
 
 1
 On Petition for Review of an Order of the Occupational Safety and Health Review Commission, No. 94-910.
 
 OSHRC
 
 2
 REVIEW DENIED.
 
 
 3
 Before: NELSON and MOORE, Circuit Judges, and CLELAND, District Judge.*
 
 
 4
 CLELAND, District Judge.
 
 
 5
 Stein, Inc. has petitioned this court for review of an order of the Occupational Safety and Health Review Commission fining Stein $14,000 for two violations of OSHA safety standards in connection with the October 21, 1993 electrocution death of Eugene Wind. The issues before the court are whether Stein was "an employer" responsible for the operations at the scene of the accident, whether Stein violated 29 C.F.R. § 1926.550(a)(15)(i) by operating a crane within ten feet of an electrical transmission line without de-energizing the line or using insulating barriers, and whether Stein violated 29 C.F.R. § 1926.20(b)(2) by failing to conduct an accident-prevention inspection of the site. Stein also argues that the penalties assessed were arbitrary and capricious. We deny the petition.
 
 I.
 
 6
 Stein is a contractor engaged in the business of slag processing, steel mill services, and heavy equipment rental and maintenance. One of Stein's major customers is LTV Steel in Cleveland, Ohio. Stein has contracted with LTV Steel to process steel slag and scrap as part of the steel making process at LTV Steel and to provide heavy equipment and heavy equipment operators to LTV Steel for use in steel milling. To effectuate its services to LTV Steel, Stein leases property on the grounds of LTV Steel West. The area leased from LTV Steel is large enough to house, among other things, a Stein office, slag processing plant, a mechanics' shop, and locker facilities.
 
 
 7
 The steel slag and scrap is transported to the processing area by truck and must be weighed before it is processed. Historically, LTV Steel has used a large truck scale near the front gate to weigh the slag and scrap. Because the area around this scale was becoming congested, LTV Steel decided to construct another scale for weighing slag and scrap and to dedicate the existing scale to its finished products. LTV Steel required Stein to provide another motor truck scale for nonfinished products such as the slag. This new truck scale was to be constructed on LTV Steel's grounds in an area that had been previously leased to Stein. Stein and LTV agreed on the area for construction of the new scale, though Stein contends that LTV Steel was ultimately responsible for the location of the new scale. The scale was intended for use by both LTV and Stein.
 
 
 8
 Stein had no expertise in scale construction and/or installation. So, in April 1994, Stein entered into a contract with Brechbuhler Scales to install a new Thurman truck scale. Brechbuhler was chosen for installation because it was the only authorized dealer of Thurman scales in the Cleveland area. In turn, Brechbuhler subcontracted to Valentino Comardo the construction of the concrete pad upon which the truck scale was to be built.
 
 
 9
 Under the terms of the Brechbuhler contract, Stein was responsible for "site preparation, crane services, backfill, conduit, trenching, [and] power supply...." The trenching, backfilling, and installation of conduit for the electrical hookup were to be completed after Brechbuhler completed its work. Stein was able to negotiate a lower price for the contract with Brechbuhler because it agreed to perform some of the work, including crane services; this was economical for Stein because it already had lifting equipment at the site.
 
 
 10
 Supplying crane services--leasing a crane and/or crane operator--to its customers is a significant part of Stein's business. Stein's usual practice is not to supply a "ground man" but to rely on the customer to provide that person, whose responsibility is to direct the movement of the crane. Stein's position is that, in all cases, the customer controls the operation of the crane when it is on the customer's job site. On at least one other occasion prior to the contract at issue here, Stein had provided a crane and operator to Brechbuhler, and Brechbuhler had provided its own ground man.
 
 
 11
 A ground man is important, especially when working with overhead wires, because the crane operator has limited visibility when seated inside the cab. The operator's field of vision is often obstructed, and depth perception is impaired. As a result, the operator is dependent upon the hand signals provided by the ground man for crane movements. Eugene Wind, an employee of Brechbuhler, was the ground man at the scale installation site. According to Stein, Wind or his supervisor Roger Doerr was in charge of all crane movements.
 
 
 12
 It was not Stein's usual practice to de-energize power lines or place insulating sleeves on them as a precaution against electrocution hazards in work involving cranes. Instead, Stein relied on the ground man to direct the crane operator away from the lines.
 
 
 13
 The scale installation proceeded in stages over a period of several months. First, Stein leveled and graded the area where the scale was to be installed. The concrete pad was then installed by the cement subcontractor. The next step was the scale installation by Brechbuhler. Stein would then dig the excavation for the electrical conduit. Finally, the electrical hookups to the scale would be made and the excavation backfilled.
 
 
 14
 Stein decided the location of the scale, while the dimensions of the scale were decided by a joint agreement between Stein and LTV. The installation worksite was approximately two hundred feet square in size. The concrete foundation for the scale was positioned immediately adjacent to utility poles carrying a telephone line at a height of approximately 30 feet and a 13,000-volt power lines at a height of approximately 50-60 feet. The power lines were located throughout the LTV facility. It was common for Stein to operate cranes in the vicinity of power lines, and Stein workers were familiar with the site on which they were working on the day in question. According to Stein, its crane operators are thoroughly trained in the hazards associated with contacting electrical wires and the safety precautions to take in order to avoid contact with electrical wires. The training includes monthly safety meetings, individual instruction of operators, and the dissemination of safety brochures to operators. Signs warning against accidental contact and maintaining safe distance (a minimum of ten feet) were posted on every crane cab and throughout the LTV Steel plant. Finally, Stein's work rule is that operators are not permitted to operate cranes within ten feet of overhead lines. OSHA points out, however, that Stein employee Scott Steiskal, a mechanic who operated the crane on the day in question, testified that no one at Stein ever instructed him with respect to operating a crane in the presence of electric power lines. Steiskal added, "Pretty much common sense. You stay away from them."
 
 
 15
 The scale installation began on October 21, 1993 with the arrival of a Brechbuhler truck with scale parts on it. Upon the request of the Brechbuhler sales representative who negotiated the scale contract with Stein, a crane and a crane operator, Scott Steiskal, were loaned to Brechbuhler by Stein on October 21. Upon obtaining a 390 Grove overhead crane, Steiskal drove it approximately two hundred yards to the Brechbuhler work site in order to unload the scale pieces from the truck.
 
 
 16
 OSHA Compliance Officer Frank Coffelt testified that the operation was under the control of Brechbuhler. Steiskal received all of his instructions on how to offload the scale parts from, and was assisted by, two employees of Brechbuhler, Eugene Wind and Roger Doerr. According to Coffelt, the only supervisor at the site at any time was Mr. Doerr. Wind acted as the ground man and directed all of Steiskal's crane movements by hand signal. Wind also decided where to unload the scale parts and directed Steiskal to do so. Based upon Wind's statements on October 21, it was clear that he had previously worked around electrical wires, was aware of the potential danger and was aware of preventative measures.
 
 
 17
 About mid-morning, Steiskal's supervisor, David Pafford, stopped by the scale installation site while Steiskal was off-loading the scale parts to inquire when Steiskal would be finished. Pafford also pointed out the electrical wires to Steiskal in order to ensure that he was aware of their presence. Pafford left the site after this brief encounter.
 
 
 18
 Once Steiskal positioned the crane north of the electrical wires, Wind suggested that the crane be moved closer to the truck. Steiskal was unable to move the crane closer because there was a mechanical problem with the electrical shift mechanism on the crane. Wind then decided to off-load the scale parts north of the concrete pad and overhead lines. According to Steiskal, if the crane would have been relocated to the area suggested by Wind, the scale parts would have been unloaded closer to the overhead wires. Steiskal never raised the boom of the crane above the telephone line--which acted as a barrier to the electrical wires--while unloading the truck. As a result, he never came within twenty-five feet of the electrical wires.
 
 
 19
 After Steiskal completed the task of unloading the scale parts from the truck, he was replaced by another operator, James Cyrulik. At the direction of Mr. Wind, Cyrulik, a crane operator for twenty-one years, dragged the scale parts that had been previously unloaded by Steiskal south of the electrical wires, under the telephone line to a location next to the scale's concrete foundation. According to Doerr, Brechbuhler's service manager and the only supervisor at the scale installation site, Cyrulik moved the scale parts to the location where Wind had previously intended for Steiskal to off-load them. Cyrulik then moved the crane to a position south of the electrical wires in order to install the scale pieces on the concrete foundation. During the installation of the scale pieces, Cyrulik was unable to gauge the proximity of the boom to the electrical wires and, therefore, was dependent upon Wind's hand signals. While in the process of installing the scale, the boom of the crane came within ten feet of the overhead lines and became energized. Wind, who was rigging a piece of the scale to the boom of the crane with a chain sling, was electrocuted.
 
 
 20
 The crane was stationary at the time of this incident. Cyrulik leapt from the crane and started CPR on Wind. Abandoning the safety of the insulated cab, he exposed himself to electrocution, too. Fortunately, though, Cyrulik was not electrocuted. Steiskal and Cyrulik testified that they understood Wind's hand signals and would have stopped operating the crane if they had been aware that the crane had come so close to the wires.
 
 
 21
 It is not clear what happened to make the crane come in contact with the electricity. Cyrulik testified that he believed the power line--which had an approximately three-foot sag--moved in the wind to contact the crane. Doerr testified that he did not look up and did not know "if the crane boomed up into the wires or if the wires arced to the boom of the crane." In other words, the electricity may have arced from the high-voltage power line to the crane without the crane ever coming into physical contact with the wire.
 
 
 22
 The accident occurred on October 21, 1993. OSHA began an investigation on October 28, 1993. On February 22, 1994, the Secretary issued citations to Stein charging seven violations of OSHA safety standards. The OSHA investigator, Coffelt, recommended the assessment of the maximum penalty of $7,000 for five of the seven violations originally assessed to Stein. On March 16, 1994, Stein filed a notice of contest with OSHA, invoking the jurisdiction of the Review Commission. On April 4, 1994, the Secretary of Labor filed his complaint with the commission, alleging that Stein violated the standards set forth in items one through seven of Citation No. 1. Stein answered the complaint, and a hearing was held before the Honorable Nancy J. Spies, Administrative Law Judge for the Review Commission in Cleveland, Ohio on September 14 and 15, 1994. At the hearing, the Secretary vacated Item 6 of Citation No. 1 and the corresponding proposed penalty.
 
 
 23
 On March 13, 1995, the ALJ issued her decision and order holding that Stein shared control over the crane operators working at the scale installation site and was, therefore, an employer for citation purposes. While the ALJ vacated Items 2, 3, 4, and 5 of Citation No. 1 and the proposed penalty associated with each of these items, she affirmed Items 1 and 7 and the corresponding proposed penalty of $7,000 each.
 
 
 24
 On April 19, 1995, Stein filed a Petition for Discretionary Review as to those portions of the ALJ decision and order which adversely affected Stein. On May 16, 1995, the Review Commission issued a Notice of Final Order making the March 13, 1995 ALJ Decision and Order a final order of the Review Commission on May 8, 1995 when no member of the Review Commission directed the decision for discretionary review. On June 21, 1995, Stein timely filed its Petition for Review of the ALJ decision with the Sixth Circuit.
 
 
 25
 The citation items which Stein challenges assert (1) that Stein violated 29 C.F.R. § 1926.550(a)(15)(i) when Stein employee Cyrulik operated the Stein crane within 10 feet of electrical transmission lines without either de-energizing them or utilizing insulating barriers; and (2) that Stein violated 29 C.F.R. § 1926.20(b)(2) when Stein failed to conduct an accident-prevention inspection of the truck-scale construction site.
 
 
 26
 The OSHA investigator, Coffelt, apparently testified that the maximum penalty was assessed to Stein pursuant to a February 9, 1994 internal memorandum on OSHA enforcement which affected penalty assessments to employers in Michigan and Ohio. According to Stein, it did not meet the explicit criteria set forth in the memorandum. Stein argues that, as a result, OSHA failed to consider Stein's size, history of violations and good faith in arriving at penalties in this case. The ALJ, however, expressly addressed the four penalty criteria prescribed by the statute and expressly discounted the internal OSHA memorandum.
 
 II.
 
 27
 The ALJ's decision that Stein was an employer within the meaning of the OSHA with respect to the crane operation is supported by substantial evidence. "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 29 U.S.C. § 660(a). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Advance Bronze, Inc. v. Dole, 917 F.2d 944, 950 (6th Cir.1990) (quoting Empire-Detroit Steel v. OSHRC, 579 F.2d 378, 383 (6th Cir.1978)). "[A]djudicatory conclusions of the Commission can be set aside only when they are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Advance Bronze, 917 F.2d at 950 (quoting 5 U.S.C. § 706(2)(A)).
 
 
 28
 The most important factor in determining whether an entity is an employer is "who has control over the work environment such that abatement of the hazards can be obtained." MLB Industries, Inc., 12 BNA OSHC 1525, 1985 CCH OSHD p 27,408 at 35, 570 (No. 83-231, 1985). Also helpful is the "economic realities test" described in Loomis Cabinet Co., 15 BNA OSHC 1635, 1637, 1992 CCH OSHD p 29,775 (No. 88-2012, 1992). The economic realities test employs the following factors:
 
 
 29
 1) Whom do the workers consider their employer?
 
 
 30
 2) Who pays the workers' wages?
 
 
 31
 3) Who has the responsibility to control the workers?
 
 
 32
 4) Does the alleged employer have the power to control the workers?
 
 
 33
 5) Does the alleged employer have the power to fire, hire, or modify the employment condition of the workers?
 
 
 34
 6) Does the workers' ability to increase their income depend on efficiency rather than initiative, judgment, and foresight?
 
 
 35
 7) How are the workers' wages established?
 
 
 36
 Id. at * 2. Both Steiskal and Cyrulik testified that Stein was their employer; that Stein paid both of them; and that Stein had the power to fire, hire, or modify their employment. Stein also established their wages. A Stein employee, Mr. Ellsworth, assigned Steiskal to operate the crane and then replaced him with Cyrulik. This change had nothing to do with Brechbuhler.
 
 
 37
 Stein's position advocates a very narrow focus of inquiry; Stein asks the court to focus on which company directed the movement of the crane into close proximity with the power line. According to Stein, Cyrulik was entirely dependent upon Wind to tell him where to operate the crane, and he made no judgments of his own in this regard.
 
 
 38
 Even if the law required the court to take this narrow view--and Stein cites no authority for the proposition that it does--there is still substantial evidence to support the ALJ's conclusion that Stein exercised sufficient control to be considered an employer. It is undisputed that Stein employees were responsible for moving the crane in response to Wind's directions. Certainly Cyrulik had control over the movement of the crane, in the sense that his action was required to move the crane where Wind directed it. Cyrulik also testified that he could see the wires from inside the cab, though he could not accurately gauge the distance between the crane and the wires. He could, no doubt, tell that the crane was above the phone wire, though, and he must have had some idea that crane was extended upward quite far. Furthermore, both crane operators testified that they were aware that they could stop working if they felt Wind was directing them too close to the lines. Therefore, even taking this narrow focus of inquiry, there is substantial evidence to support a conclusion that Stein was an employer.
 
 III.
 
 39
 Stein argues that it did not violate 29 C.F.R. § 1926.550(a)(15)(i) because it did not actually or constructively know that the crane operator would come within ten feet of the overhead wires.
 
 
 40
 The knowledge requirement is stems from the case law, not the regulation itself, and is intended to protect companies from being fined for conditions they had no reason to know about. The regulation provides:
 
 
 41
 Except where electrical distribution and transmission lines have been deenergized and visibly grounded at point of work or where insulating barriers, not a part of or an attachment to the equipment or machinery, have been erected to prevent physical contact with the lines, equipment or machines shall be operated proximate to power lines only in accordance with the following:
 
 
 42
 (i) For lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet;
 
 
 43
 ............................................................
 
 
 44
 ....................
 
 
 45
 * * *
 
 
 46
 29 C.F.R. § 1926.550(a)(15)(i). This court has recently held that in order to establish a violation pursuant to § 5(a)(2) of the Act, the Secretary must show by a preponderance of the evidence that the employer "knew or could have known of the hazardous condition with the exercise of reasonable diligence." Carlisle Equip. Co. v. United States Secretary of Labor, 24 F.3d 790, 792 (6th Cir.1994).
 
 
 47
 Stein concedes that the electrical lines in question had not been deenergized or covered with insulating barriers and that the clearance between the lines and the crane was less than 10 feet at the time of the accident. It is undisputed that Stein was aware of the presence of high-voltage power lines over the construction site. This knowledge is sufficient to meet the knowledge requirement of Carlisle Equip.; it is not necessary that Stein actually or constructively know that the crane would come within ten feet of the lines. Actual knowledge of the presence of the lines and the hazard they posed is sufficient to support a finding of liability.
 
 IV.
 
 48
 Stein challenges the finding that it committed a serious violation of 29 C.F.R. § 1926.20(b)(2), which requires contractors to "provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons designated by the employers." Stein has come forward with no evidence to suggest that it has designated one or more "competent persons" to make "frequent and regular inspections." Indeed, Stein does not allege that it complied with this regulation, but instead argues that it is unreasonable to require it to do so because it took other reasonable steps to inform workers of the danger, including inspecting the site in connection with the overall project, making crane operators aware of the wires, conducting safety discussions about the wires, and posting signs on the property and each crane cab. Furthermore, there is no indication that the failure to have frequent and regular inspections by a competent person caused the accident; all parties at the site were undoubtedly aware of the presence of the wires and the hazards they posed.
 
 
 49
 The regulations, however, provide for penalties for their infraction regardless of whether the infraction actually causes an accident or injury. Stein has not come forward with any authority which would require causation between its failure to conduct inspections and the accident that actually occurred. Because it is undisputed that Stein did not meet the requirements imposed by the regulation, the Commission's decision is supported by substantial evidence.
 
 V.
 
 50
 Stein argues that the penalties assessed against it are arbitrary and capricious. Specifically, Stein argues that the compliance officer "applied an internal memorandum that ran counter to the OSHA's Field Operations Manual in an effort to inflate artificially and proposed penalties to the statutory limit for a serious violation." Stein also argues that the ALJ failed to take into account those factors upon which the gravity assessment depends, such as the number of employees exposed, the duration of the exposure, the precautions taken against injury, and the likelihood that an injury would result.
 
 
 51
 The penalties assessed against Stein are within the range authorized by statute and, therefore, are subject to a deferential standard of review. "[A]djudicatory conclusions of the Commission can be set aside only when they are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Advance Bronze, 917 F.2d at 950 (quoting 5 U.S.C. § 706(2)(A)). While Stein argues that the compliance officer relied upon an inappropriate internal memorandum rather than OSHA's Field Operations Manual, this court's task is to review the determination of the Commission, not to look into the methods employed by compliance officers. There is no indication that either the ALJ or the OSHA area director who was ultimately responsible for determining the amount of the penalty relied upon the memorandum in question. Furthermore, the gravity-related factors cited by Stein (and the Commission) are not prescribed by statute and are not binding. Stein does not dispute that the law authorizes penalties of up to $7000 for serious violations of the regulations. In light of the fact that this incident resulted in a death, the application of the maximum penalty was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 VI.
 
 52
 The petition is denied.
 
 
 
 *
 The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation