28 F.3d 1213
 16 O.S.H. Cas. (BNA) 1889
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
HAMILTON FIXTURE, Petitioner-Appellant,
v.
SECRETARY, UNITED STATES DEPARTMENT OF LABOR; and
Occupational Safety and Health Review Commission,
Respondents-Appellees.
 No. 93-3615.
 United States Court of Appeals, Sixth Circuit.
 July 1, 1994.
 
 Before: GUY and BOGGS, Circuit Judges; and WOODS, Senior District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Following an Occupational Safety and Health Administration ("OSHA") inspection, petitioner was cited for violating the Occupational Safety and Health Act of 1970 ("Act"), 29 U.S.C. Secs. 651-678, by failing to comply with several of the Act's implementing regulations. Having unsuccessfully availed itself of the administrative review process, petitioner filed the instant appeal, challenging the manner in which the inspection was conducted. Finding no merit to petitioner's arguments, we affirm.
 
 I.
 
 2
 This case arises out of a 1988 OSHA inspection of a manufacturing facility operated by Hamilton Fixture ("Hamilton"), a company that employs approximately 350 persons and specializes in the manufacture of wooden store displays for greeting cards, books, and tapes. As a result of the inspection, OSHA issued three citations that charged Hamilton with numerous violations of safety and health standards under the Act.
 
 
 3
 Before addressing the specific circumstances that led to the inspection, a review of the relevant statutory framework is necessary to bring this controversy into sharper focus. The Act was adopted "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources[.]" 29 U.S.C. Sec. 651(b); see also id. Sec. 654(a)(1) (An employer must "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees[.]"). To enforce the Act's provisions, the Secretary is authorized "to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent or employee." Id. Sec. 657(a)(2).
 
 
 4
 Congress also envisioned that employees would have a role to play in enforcement--and with good reason. As this court has previously explained: "Congress was aware of the shortage of federal and state occupational safety inspectors, and placed great reliance on employee assistance in enforcing the Act. Furthermore, it is clear that without employee cooperation, even an army of inspectors could not keep America's work places safe." Marshall v. Whirlpool Corp., 593 F.2d 715, 722 (6th Cir.1979) (footnote omitted), aff'd, 445 U.S. 1 (1980). To this end, the Act entitles any employee to submit a formal request for an inspection of his workplace. 29 U.S.C. Sec. 657(f)(1).
 
 
 5
 Here, it was precisely this sort of employee action that precipitated the OSHA inspection. In March 1988, Local 415 of the Ohio Carpenters Industrial Council, the union representing Hamilton's production employees, sent OSHA's Cincinnati Area Office "a typewritten, signed complaint ... alleging that, against the union's objections, management employees at the main plant were: (1) not using protective equipment for their eyes (throughout the plant), their ears (around machinery), and their feet (in restricted areas); (2) not using guards on mill machines in operation; and (3) operating tow motors without proper training." (App. 57) (footnote omitted). Evidently, the general employee population was informed of the complaint through a handbill entitled "415 Combat," which stated in relevant part: "March 14, 1988, charges were filed with OSHA, asking for an extended visit at the plant. This was caused by the Company's gross violation of their own work and safety rules." (App. 349.)
 
 
 6
 James Washam, the safety supervisor in the Cincinnati OSHA office, decided against taking action on the union's complaint at that point, however, because he felt that the listed allegations were too vague. Instead, Washam directed Jim Zucharo, a compliance officer, to contact the union and request additional, more detailed information. Washam authorized the inspection of the Hamilton plant only after the union supplied the agency with information identifying the employees who were alleged to have been exposed to hazardous conditions, the nature of the hazards, and the times of exposure.
 
 
 7
 For Hamilton, the timing of the union's complaint was less than auspicious. Less than two weeks before, Hamilton's collective bargaining agreement with the union had expired. Although the employees did not strike, according to Hamilton, they did "attempt[ ] to pressure Hamilton into acceding to their bargaining proposals by engaging in a work slowdown, in-plant demonstrations, sabotage, and vandalism." (Petitioner's Brief at 1.) That such tactics were being utilized is confirmed, at least in part, by 415 Combat, which reads like a status report for the employee-management negotiations. In addition to informing the employees about the complaint filed with OSHA, 415 Combat lauded the employees' poor productivity levels:
 
 
 8
 5. Give yourselves a pat on the back! We are in there working, and production was down 42% last week. Who knows what it might be for this week?
 
 
 9
 6. Congratulations to first shift Finish Line! Though overall production was down 42%, the Finish Line was told that their's was Much Lower Than That! We're very Proud of that Fact!
 
 
 10
 (App. 349.)[1]
 
 
 11
 The "tense" environment within the Hamilton facility, however, did not keep OSHA from following through with its inspection. In fact, as the Secretary of Labor ("Secretary") notes, the agency's "Field Operations Manual" ("FOM") explicitly provides that "[p]lants or establishments may be inspected regardless of the existence of labor disputes involving work stoppages, strikes or picketing." (App. 379.) The FOM adds:
 
 
 12
 As a rule, unprogrammed inspections (complaints, fatalities, etc.) will be performed during strikes or labor disputes. However, the seriousness and reliability of any complaint shall be thoroughly investigated by the supervisor prior to scheduling an inspection to ensure as far as possible that the complaint reflects a good faith belief that a true hazard exists and is not merely an attempt to harass the employer or to gain a bargaining advantage for labor.
 
 
 13
 (Id. at 379-80.)[2]
 
 
 14
 Washam assigned Ralph Cannon, a senior compliance officer, to conduct the Hamilton inspection. Cannon had been with OSHA since 1973 and, to that point, had performed approximately 1900 inspections.[3] Cannon also had considerable experience with unions, having served, in Hamilton's words, as "a Union activist his entire adult life." (Petitioner's Brief at 3-4) (App. 153). A member of the Operative Plasterers and Cement Masons Union since 1954, Cannon became that union's recording secretary in 1961--a position he still occupied at the time the Hamilton inspection took place.
 
 
 15
 The inspection commenced on April 20, 1993. Cannon met with two company officials--Plant Engineer and Director of the Safety Committee Richard Maurer and Production Manager David Mueller--and explained to them that, as a preliminary matter, he would review the company's injury records to determine its Lost Work-Day Injury ("LWDI") rate. Only if this figure exceeded the national average would a comprehensive, "wall-to-wall" inspection then take place.[4] After Hamilton's records revealed its LWDI rate to be three times the national average, the company consented to the expanded inspection.
 
 
 16
 As part of his inspection, Cannon walked around the facility, inspecting equipment and interviewing employees. From the outset, the manner in which Cannon conducted the investigation irked Hamilton officials. For instance, on the first day of the walk around, Maurer expressed his concern that Cannon was interviewing too many employees. The company relayed Maurer's concerns to its counsel, who, in turn, discussed the issue with Cannon and Washam in a conference call. Although the parties did not agree to terminate the interviews, Cannon did reduce the number of interviews for the remainder of the inspection.[5] Hamilton officials also accused Cannon of "staging" a photograph to support an alleged safety violation. This incident involved an electrical cord that was lying across an aisle. Although most of the cord was fastened to the floor with duct tape, a portion of the cord was exposed, apparently because some of the tape had worn away. Mueller and Maurer claimed that, before photographing the cord, "Cannon removed [more of the] tape from the cord, pulled the center of the cord up off the ground, and then took a picture of the 'tripping hazard' he had just created." (Petitioner's Brief at 6) (record citations omitted). Cannon, however, offered a different account of the incident, contesting the assertion that he tampered with the cord.
 
 
 17
 The inspection, which lasted five days, concluded on May 3, 1988, and resulted in the issuance of three citations.[6] These citations referred to numerous specific violations--some of which were repeat violations--of OSHA safety standards. Prior to a hearing before an administrative law judge ("ALJ"), Hamilton moved to dismiss the citations, arguing that the wall-to-wall inspection was unreasonable given the volatile labor situation at the facility. Hamilton also questioned Cannon's motives, asserting that he conducted the inspection with an eye towards assisting the union (vis-a-vis management) in the ongoing dispute. The ALJ rejected Hamilton's arguments and affirmed most, but not all, of OSHA's citation items. In so doing, however, the ALJ did take into account "the unique circumstances of this case relating to the on-going labor problems at the facility" by reducing Hamilton's penalties, stating:
 
 
 18
 Although allegations of employee sabotage have been rejected in this case, the court is aware that the then-current labor situation at the plant may have resulted in lower than normal standards of safety. While such a situation does not exempt the employer from compliance with OSHA's standards, it can have a mitigating effect on the penalties assessed.
 
 
 19
 (App. 49.)
 
 
 20
 Hamilton petitioned the Occupational Safety and Health Review Commission ("Commission") for review of the ALJ's decision. The Commission affirmed the ALJ's denial of Hamilton's motion to dismiss and affirmed as to 11 of the 13 citation items presented for review. This appeal followed.
 
 II.
 
 21
 We analyze Hamilton's various arguments in light of the operative standard of review, which we discussed in Empire-Detroit Steel Division, Detroit Steel Corp. v. Occupational Safety and Health Review Commission, 579 F.2d 378 (6th Cir.1978):
 
 
 22
 29 U.S.C. Sec. 660(a) requires that "findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." Substantial evidence [has been] defined by this court ... as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moreover, adjudicatory conclusions of the Commission can be set aside only when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 
 23
 Id. at 383 (citations omitted); see also Trinity Indus., Inc. v. Occupational Safety and Health Review Comm'n, 16 F.2d 1455, 1459 (6th Cir.1994) (quoting National Eng'g & Contracting Co. v. OSHA, 928 F.2d 762, 767 (6th Cir.1991)).
 
 A.
 
 24
 Hamilton first takes issue with the length and scope of the inspection. It argues, in essence, that OSHA either should have conducted a more circumscribed inspection or should have waited until the turmoil within the facility had subsided before engaging in a full-blown, wall-to-wall inspection. OSHA's failure to take either of these courses, it is urged, had certain harmful consequences for the company. For instance, the inspection, occurring as it did in the midst of the turmoil, "impermissibly entangled OSHA in the labor dispute" and thereby gave the impression that the agency sided with the employees. (Petitioner's Brief at 9.) Hamilton further maintains that OSHA contravened its own regulations by not adequately investigating the reliability of the allegations listed in the employees' complaint to determine whether those allegations had been made in good faith. Moreover, Hamilton insists that, due to the unrest within the facility, it could not ensure that its employees were doing their part to promote company safety practices; to the contrary, the inspection provided the disgruntled employees with an "ideal opportunity" to harass their employer by creating hazardous conditions out of what would otherwise be innocuous ones.
 
 
 25
 Hamilton's argument, then, turns on an assessment of the reasonableness of the inspection in question. Again, 29 U.S.C. Sec. 657(a) mandates that such an inspection be reasonable in time, limit, and manner. The failure of OSHA to inquire thoroughly into the labor problems at its facility, Hamilton contends, rendered the resultant inspection "unreasonable" within the meaning of the Act. Hamilton thus does not contest that an inspection of some sort should have occurred, but only that the inspection that actually occurred did not conform to the dictates of the Act. Notwithstanding Hamilton's assertions, we conclude that, far from violating Sec. 657(a) or other applicable provisions of the Act, OSHA acted in conformity therewith.
 
 
 26
 In fact, under the circumstances, the agency's conduct was measured and deliberate, not arbitrary or biased. Washam did not authorize the inspection immediately upon receiving the employee's complaint; instead, he directed Zucharo to obtain additional information. Cannon did not conduct a wall-to-wall investigation until he determined that Hamilton's LWDI rate exceeded the national average by a factor of three. And, after Hamilton and its counsel complained about his interviewing practices, Cannon substantially reduced the number of interviews he conducted during the remaining days of the inspection.
 
 
 27
 Furthermore, Hamilton's contention that OSHA should have deferred the inspection until the resolution of the labor dispute is untenable as a matter of both policy and practicality. From a policy standpoint, the overarching objective of the Act is clearly the protection and promotion of safe and health working conditions. See 29 U.S.C. Sec. 651(b). To this end, the Act requires that the Secretary expeditiously investigate allegations of safety violations made by employees: "If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable, to determine if such violation or danger exists." Id. Sec. 657(f)(1) (emphasis added). Here, there were indeed reasonable grounds to believe that Hamilton was not in complete compliance with applicable safety standards. Under these circumstances, the Secretary would have violated his statutory duty had he taken the course Hamilton urges and delayed his inspection until the labor unrest had ceased at the facility.
 
 
 28
 On a practical level, requiring, as Hamilton would, OSHA to explore extensively the nature of labor disputes before performing inspections would unduly burden the agency. Hamilton contends, without citing authority, that the Secretary could have:
 
 
 29
 (1) requir[ed] the Complainant to verify under oath the existence of the alleged hazards; (2) contact[ed] non-management employees at Hamilton (who could be identified from the files of prior OSHA inspections) to discuss the nature of the labor dispute and other relevant conditions in the plant; and (3) contact[ed] other federal agencies involved in the dispute such as the Federal Mediation and Conciliation Service and the National Labor Relations Board.
 
 
 30
 (Petitioner's Brief at 16-17) (record citations omitted). As Washam testified, however,
 
 
 31
 that would mean that any time we go into any organized shop and make investigations of complaints that we would have to undertake some major investigations to find out the motives of those individuals filing complaints with us, which would strictly curtail our activity and add more time to processing complaints and actually bog us down if we had to make those types of investigations.
 
 
 32
 (App. 249.)
 
 
 33
 Finally, it should be noted that the inspection took place with Hamilton's consent and in the presence of Hamilton officials. The significance of the former fact was addressed in Donovan v. A.A. Beiro Construction Co., 746 F.2d 894 (D.C.Cir.1984). Beiro, like this case, involved a company's challenge to the scope of an OSHA inspection. The Beiro court rejected the notion that, where valid consent has been obtained, OSHA may not expand its inspection beyond the specific allegations listed in the particular employee complaint. The court stated:
 
 
 34
 Beiro is erroneously equating consensual and warrant searches. Under Marshall v. Barlow's, [Inc., 436 U.S. 307 (1978) ] probable cause for an administrative warrant may consist of either a showing that the inspection is pursuant to reasonable administrative standards (section 657(a) inspection) or specific evidence of an existing violation (section 657(f) inspection). There is a split in authority with respect to whether a specific employee complaint supports a wall-to-wall inspection ... or only a limited inspection bearing an appropriate relationship to the violation alleged.... This conflict is over the scope of inspections pursuant to administrative warrants, particularly whether a specific employee complaint constitutes sufficient probable cause for a magistrate to issue a warrant for a wall-to-wall inspection. This is not an issue in the case at hand because the District [of Columbia provided valid third-party consent] to the wall-to-wall inspection."
 
 Id. at 903-04 (citations omitted).[7]
 
 35
 For the foregoing reasons, we hold that the wall-to-wall inspection of the Hamilton facility was "reasonable" within the meaning of the Act. We therefore decline Hamilton's invitation to disturb the Commission's ruling on the matter.
 
 B.
 
 36
 Next, Hamilton focuses on Cannon, calling into question his impartiality and integrity. In leveling its attack, Hamilton highlights Cannon's affiliation with the Plasterers and Cement Masons Union. Hamilton claims that, as a long-time union operative, Cannon's neutrality could not have been safely assumed. And if Hamilton is to be believed, the animus runs deep: "Union affiliations are often powerfully compelling, arousing passion and prejudice in some individuals. The history of unions and management in this country has often been one of violence and other illegal acts committed in the supposed furtherance of Union objectives." (Petitioner's Brief at 20-21.) Hamilton further alleges that, apart from merely having the opportunity to assist his union brethren, Cannon actually manifested his true colors on several occasions. In this regard, Hamilton cites the safety hazard (involving the electrical cord) that Cannon is alleged to have staged.
 
 
 37
 Our review of the record, however, convinces us that Hamilton's assertions are without merit. First, we reject Hamilton's attempt to impute bias on Cannon on the basis of his union affiliation. The ALJ had a very different view of Cannon's fitness for the inspection. He characterized Cannon as a compliance officer with a "very high reputation" (app. 152) and ultimately found that "his conduct and testimony did not bear a trace of bias, prejudice, or animosity towards Hamilton, which, considering its assaults on his integrity, demonstrated considerable self-restraint." (App. 17.) Despite cautioning OSHA against "giving the appearance of partiality by assigning an inspection of this type to a compliance officer who is a union member" (app. 68), the Commission, too, found little problematic about Cannon's background--a conclusion with which we are in agreement.[8]
 
 
 38
 Equally unavailing is Hamilton's contention that the ALJ and the Commission misconstrued Cannon's role in the allegedly staged electrical cord incident. Hamilton submits that Cannon's version of what transpired should not have been preferred over that of company officials for the following reasons: (1) his testimony in relation to other citation items was "riddled with ... inconsistencies and improbabilities" (Petitioner's Brief at 28); (2) the ALJ, in crediting Cannon, impermissibly relied on information outside of the record; (3) Cannon's testimony on the staging incident was inconsistent and evasive; (4) the ALJ failed to take into account Cannon's "strong personal interest in not being found guilty of misconduct during the course of an inspection" (id. at 35); (5) neither the ALJ nor the Commission adequately explained their reasons for discrediting the officials' side of the story; and (6) there was no corroborating testimony to lend credence to Cannon's account.
 
 
 39
 Put simply, this issue boils down to a question of credibility. In First National Monetary Corp. v. A.J. Weinberger, 819 F.2d 1334 (6th Cir.1987), we stated:
 
 
 40
 Credibility determinations ... are generally not to be set aside unless found to be inherently incredible or patently unreasonable. Appellate courts defer to the finder of fact, because the fact finder has the opportunity to observe the witnesses' demeanors. However, "[a] reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative action on appeal." A reviewing court must consider evidence which fairly detracts from the weight of the credibility determination, and in a case where one witness's testimony is flatly contradicted by several others, the court must carefully examine the credibility finding.
 
 
 41
 Id. at 1339 (citations omitted).
 
 
 42
 In the instant case, the ALJ's relative credibility evaluation is neither "inherently incredible" nor "patently unreasonable" and will therefore not be disturbed. See Advance Bronze, Inc. v. Dole, 917 F.2d 944, 951 (6th Cir.1990) ("As the factfinder, the ALJ was entitled to credit the Secretary's evidence over that of the employer...."). In fact, as the following testimony taken from Maurer's cross-examination reveals, whether Maurer's account directly conflicted with that offered by Cannon is, itself, subject to some dispute:
 
 
 43
 Q. Your allegation is Mr. Cannon pulled the tape off the cord and actually created the tripping hazard?
 
 
 44
 A. No.
 
 
 45
 Q. This is a serious allegation, Mr. Maurer. You better be clear on what you are accusing him of in this instance.
 
 
 46
 A. All I am saying is I observed the compliance officer pull tape from a worn spot, pull or tug at it, kick the cord, and take a picture of it.
 
 
 47
 (App. 288-89.) Mueller, too, seemed to stop short of accusing Cannon outright of manufacturing the hazard. During his own cross examination, he stated:
 
 
 48
 When [Cannon] bent over, I didn't see exactly the exact condition of that tape and the cord when he reached down.
 
 
 49
 I saw it after he had already touched it and at that time, I maneuvered myself to see what he was doing. He was picking at the tape, and he grabbed with his hands the black cord and picked it up, tugged on it.
 
 
 50
 (App. 330.) In the face of this somewhat equivocal testimony, the ALJ's decision to credit Cannon's account of the incident cannot reasonably be faulted.
 
 
 51
 In the final salvo it directs at Cannon, Hamilton argues that Cannon interviewed an excessive number of employees during the walk-around phase of the inspection. In this regard, Hamilton does not contend that Cannon exceeded some statutorily predetermined allowable number of interviews. This is not surprising because there is no such statutory restriction. Rather, Hamilton claims that Cannon's interviews disrupted its operations. By Hamilton's account, however, its productivity had been severely compromised by the slowdown that commenced before the inspection took place. As the Secretary observes, "Hamilton [has] failed to identify the manner or degree to which production was being impaired by OSHA's inspection, beyond the 40% already attributable to the ... slowdown...."[9] (Respondent's Brief at 44.) Our analysis also is guided by the fact that Cannon limited the number of interviews he conducted after Hamilton informed him of its objections. Based on the facts presented, we are not persuaded that the interviews rendered the inspection unreasonable.
 
 C.
 
 52
 Because we conclude that OSHA's inspection of the Hamilton facility comported with applicable law, we need not reach Hamilton's contention that it was prejudiced by the Secretary's decision to conduct a wall-to-wall, as opposed to a more limited, inspection.
 
 
 53
 AFFIRMED.
 
 
 
 *
 Honorable George E. Woods, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Hamilton points out that this handbill was in OSHA's case intake file at the time the agency decided to go ahead with the inspection. It appears, however, that the handbill did not figure into the calculus. According to the Secretary: "Washam did not know when the document was received into the case file and did not recall seeing it at the time that the employee complaints were being processed. Cannon testified that he did not see the flyer until after he had concluded the physical inspection of the premises." (Respondent's Brief at 30) (record citations omitted) (footnote omitted)
 
 
 [2]
 Whether what was taking place at the Hamilton facility can be deemed a "labor dispute" within the meaning of the FOM is not altogether clear. Washam, for one, testified that, since the employees continued to work (albeit at a slower pace) despite the expiration of the collective bargaining agreement, neither a "strike" nor a "work stoppage" nor "picketing" had occurred
 
 
 [3]
 In fact, Cannon once before had inspected the Hamilton facility over a two-day period in July 1985. He later conducted a follow-up inspection in December of the same year and found that the company had adequately addressed the 24 separate violations for which it was cited. Although he was thus presumably familiar with the company, he did not become aware of the labor problems it was experiencing until after he received his assignment
 
 
 [4]
 More precisely, a wall-to-wall inspection would be called for in the event the figure "exceeded the Bureau of Labor Statistics' lowest average national rate for manufacturing over the past five years and if the establishment had not been subject to a full-scope inspection within a prescribed period of years." (Respondent's Brief at 13 n. 10) (record citations omitted)
 
 
 [5]
 In total, 51 persons were interviewed during the course of the five days it took to complete the inspection. The Secretary surmises that the interviews took, on average, less than six minutes, and "consum[ed] only approximately 25% of the total inspection." (Respondent's Brief at 17-18) (record citations omitted)
 
 
 [6]
 Cannon, himself, did not issue the citations. Only the Secretary (acting through OSHA's Area Director) has such authority
 
 
 [7]
 This court recently held that "[g]iven the 'increased danger of abuse of discretion and intrusiveness' presented by [employee complaint] searches, we agree with those circuits that have explicitly recognized that 'a complaint inspection must bear an appropriate relationship to the violation alleged in the complaint.' " Trinity, 16 F.3d at 1460
 
 
 [8]
 As a matter of fact, that an OSHA inspector would have more than a passing familiarity with either a union or management is, it appears, not altogether uncommon. As Washam testified:
 All of our people have background in organized labor or management.
 Any time we make an inspection, we don't want to sit down and say, "Well, did you have a background in management in General Motors for five years? You can't make this inspection. You had experience in organized labor in your background, so you can't make the inspection."
 (App. 259.)
 
 
 [9]
 Hamilton concedes as much, stating: "While it is true that Hamilton cannot quantify the interference with production stemming from the inspection, that is because the labor dispute also interfered with production and it is not possible to distinguish between the two related causes in ascertaining the impact on production." (Reply Brief at 6.)